Rel: May 10, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0468
_____

## Ex parte Cardinal Health, Inc., et al.

## PETITION FOR WRIT OF MANDAMUS

## (In re: DCH Health Care Authority et al.

## v.

## Purdue Pharma, L.P., et al.

## and

## Fort Payne Hospital Corporation et al.

## v.

**McKesson Corporation et al.)**

**(Conecuh Circuit Court: CV-19-7 and CV-21-900016)**

SHAW, Justice.

PETITION DENIED. NO OPINION.

Parker, C.J., and Wise, Bryan, Mendheim, Stewart, and Mitchell, JJ., concur.

Cook, J., concurs in part and dissents in part, with opinion.

Sellers, J., dissents.

COOK, Justice (concurring in part and dissenting in part).

In these actions, a number of health-care providers have brought suit against various manufacturers and distributors of opioids. The health-care providers ("the plaintiffs") own or operate hospitals in Alabama. They allege that the manufacturers and distributors ("the defendants") have created a public nuisance in Alabama. It is fair to say that the actions are among the larger civil actions in the history of the Alabama courts.

This mandamus petition concerns a discovery dispute. The plaintiffs have alleged in their complaints that, as a result of the public nuisance, they have incurred "special damages."[1] Just over 11 weeks before trial, the plaintiffs presented an expert economic report regarding additional damages they expected to incur to implement a "mitigation plan." Sometime later, the plaintiffs presented a separate expert report setting forth the contents of that "plan." In response, the defendants

---

[1]"Generally, a public nuisance gives no right of action to any individual but must be abated by a process instituted in the name of the state." § 6-5-121, Ala. Code 1975. However, "[i]f a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action." § 6-5-123, Ala. Code 1975.

asked the Conecuh Circuit Court for permission to conduct additional fact discovery related to the costs associated with that newly disclosed "plan," but that request was denied.

As a result of that denial, the defendants are now asking this Court to issue a writ of mandamus directing the trial court to grant a continuance of the scheduled trial and to permit them to conduct discovery relating to the plaintiffs' newly presented "mitigation plan." According to the defendants, the plaintiffs' "mitigation plan" really constitutes a claim for "abatement" damages -- a forward-looking remedy designed to remove the nuisance. Because the plaintiffs previously, and repeatedly, denied that they were seeking such "abatement" damages, the defendants argue that they are now entitled to the opportunity to obtain fact discovery related to those damages.

In response, the plaintiffs argue that they are not seeking "abatement" damages. Instead, they assert that their plan constitutes merely a claim for "mitigation" damages, or costs to reduce any future damages they may incur, rather than to abate the opioid crisis in society in general.

I find this debate over the label of the damages at issue -- abatement

4

or mitigation -- to be pointless. Indeed, as noted by the defendants, "[a] party's ability to confront claims for hundreds of millions of dollars should not hinge on wordplay and gamesmanship." Reply brief at 3. Instead, I believe that the focus should be on whether the defendants are entitled to an opportunity to seek discovery of materials and information relevant to the damages the plaintiffs expect to incur to implement their "mitigation plan."  Based upon my review of the briefs, no party argues (at least not now) that the discovery that the defendants seek is irrelevant.

Nor is this discovery dispute over something small or insignificant. The "mitigation" damages sought by the plaintiffs -- between $160 and $230 million -- would essentially double the claimed damages in the cases, bringing the total damages now sought in the upcoming trial to almost half of a billion dollars.

As explained below, it is for these reasons that I respectfully dissent, in part, and would thus grant the petition and issue the writ for the limited purpose of giving the defendants the opportunity to seek what

I believe is necessary and relevant discovery.[2]

Facts and Procedural History

In September 2019, some of the plaintiffs commenced an action in the Conecuh Circuit Court against various opioid manufacturers, distributors, and retailers. In March 2021, a second set of plaintiffs commenced a similar action in the same court. Those cases were consolidated by the trial court and have previously generated a variety of petitions for the writ of mandamus before our Court on several legal issues.[3] These actions are just a fraction of the many actions across the

---

[2]I note that the defendants also argue in their petition that one of the plaintiffs, Evergreen Medical Center, LLC ("Evergreen"), failed to sufficiently comply with certain discovery requests. As a result, the defendants request that this Court continue the upcoming trial and order more discovery regarding Evergreen. Because I do not believe that the defendants have demonstrated that they have a clear legal right to such an order, I concur with this Court's decision to deny the defendants' requested mandamus relief on that issue.

[3]This petition arises from the same set of consolidated actions that have produced the prior opinions by our Court or by members of our Court. See Ex parte McKesson Corp., [Ms. SC-2023-0289, Dec. 22, 2023] ___ So. 3d ___ (Ala. 2023); Ex parte Cardinal Health, Inc., [Ms. 1210337, Mar. 17, 2023] ___ So. 3d ___, ___ (Ala. 2023) (Sellers, J., dissenting); Ex parte Endo Health Sols. Inc., 354 So. 3d 488 (Ala. 2021) (plurality opinion); and Ex parte Johnson & Johnson, 330 So. 3d 480 (Ala. 2020).

nation in both state and federal court that are making similar (and sometimes overlapping) nuisance claims related to opioids.[4]

In the consolidated actions, the plaintiffs' initial claims against the defendants were as follows:

> "'1. Plaintiffs operate hospitals that provide acute care throughout Alabama including treatment for opioid-dependent patients suffering from opioid-related conditions. These patients routinely seek services at Plaintiffs' emergency

---

[4]There have been settlements in many of those cases. There have also been several settlements by the State of Alabama -- which bear on the discovery at issue in this petition. See, e.g., Press Release, Attorney General Steve Marshall, Attorney General Marshall Announces $350 million Opioid Settlement with Multinational Marketing Firm Publicis, Office of the Alabama Attorney General (Feb. 1, 2024); Press Release, Attorney General Steve Marshall, Attorney General Steve Marshall Announces $276 Million in State of Alabama Settlements with Opioid Manufacturers, Distributor, Office of the Alabama Attorney General (Apr. 19, 2022).

A few of the remaining actions have gone through trial or judgment. See, e.g., State ex rel. Hunter v. Johnson & Johnson, 499 P.3d 719 (Okla. 2021) (reversing a $465 million trial judgment against a single defendant). See also In re National Prescription Opiate Litig., Case No. 1:17-MD-2804, Aug. 22, 2022 (N.D. Ohio 2022) (not reported in Federal Supplement); City and County of San Francisco v. Purdue Pharma, L.P., 620 F. Supp. 3d 936 (N.D. Cal. 2022); City of Huntington v. AmerisourceBergen Drug Corp., 609 F. Supp. 3d 408 (S.D. W. Va. 2022). But see, e.g., State ex rel. Stenehjem v. Purdue Pharma L.P., Case No. 08-2018-CV-01300, May 10, 2019 (D. N.D. 2019) (not reported in Federal Supplement) (dismissing a public-nuisance action against an opioid manufacturer for failure to state a claim).

7

rooms and occupy beds in the Plaintiffs' Hospitals. Hospitals are legally and morally compelled to act and treat all of these patients, regardless of the price.

"'2. Defendants are the manufacturers, distributors, and dispensers of prescription opioids. By flooding Plaintiffs' communities with opioids, by pushing false narratives surrounding the safety of opioids, and by failing to take steps to prevent diversion of opioids, they have created an epidemic of misuse, abuse, addiction, and death.'

"(Footnote omitted.) The plaintiffs also alleged that '[t]he average cost of providing care for patients diagnosed with opioid use disorder is eight times higher than for those without opioid use disorder'; that those patients must still be provided with complete care; and that 'private and government insurance does not cover these increased costs.' (Footnote omitted.) In their initial complaint, the plaintiffs further alleged that the opioid pandemic constituted a continuous and abatable public nuisance. The plaintiffs stated claims of negligence, wantonness, public nuisance, unjust enrichment, fraud and deceit, and civil conspiracy."

Ex parte McKesson Corp., [Ms. SC-2023-0289, Dec. 22, 2023] ___ So. 3d ___, ___ (Ala. 2023).

In September 2022, the plaintiffs amended their complaints to add allegations that the defendants had created an "opioid epidemic" that had caused the plaintiffs "'to incur and continue to suffer an extensive operational impact on their ability to do their jobs -- rendering care to all

8

members of the communities they serve.'" Ex parte McKesson, ___ So. 3d at ___. They thus alleged claims of negligence, wantonness, public nuisance, unjust enrichment, fraud and deceit, and civil conspiracy against the defendants.

The trial court split the consolidated cases into two litigation "tracks." The "Track One" trial, which involves plaintiffs that own and operate eight private hospitals, was set to try only the public-nuisance claim. The parties to this mandamus petition -- the defendants[5] and several of the plaintiffs[6] -- are those scheduled to participate in the "Track One" trial.

I. Discovery

During the initial phases of discovery in the present litigation, the

_____

[5]The petitioners are the following remaining defendants: Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Cephalon, Inc.; Teva Pharmaceuticals USA, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc.; Noramco, Inc.; AmerisourceBergen Drug Corp.; Anda, Inc.; Cardinal Health, Inc.; H.D. Smith, LLC; Henry Schein, Inc.; and McKesson Corporation.

[6]The respondents are the plaintiffs that own and operate the following hospitals: Evergreen Medical Center, Walker Baptist Medical Center, Princeton Baptist Medical Center, Thomas Hospital, Jackson Hospital, Crestwood Medical Center, Gadsden Regional Medical Center, and Ft. Payne/DeKalb Regional Hospital.

plaintiffs asserted that, although they had pleaded a claim for abatement damages in their complaints, they were not seeking such damages in the "Track One" trial. Despite those assertions from the plaintiffs, the defendants requested discovery relating to abatement damages. The plaintiffs objected to those requests on the basis that the requested discovery was "not relevant to the parties' claims and defenses" because abatement was not at issue.

For example, in 2021 the defendants served a series of interrogatories that, among other things, asked the plaintiffs to do the following:

> "Identify and Describe all of Your efforts to date to abate the harms alleged in the Complaint, including <u>any Educational Activities</u> aimed at either prescribers or patients, … <u>providing addiction treatment</u>, <u>expansion of the use of naloxone</u>, or any other similar activities or efforts <u>undertaken by You</u>. Include in your response <u>the specific dollar amount that You have expended on each program, initiative, or other effort You identify</u>."

(Emphasis added.) The plaintiffs objected to this request on the ground that it "<u>s[ought] the disclosure of information not relevant to the parties' claims and defenses</u>, … [was] outside the scope of permissible discovery, and <u>s[ought] information in violation of the Court's Amended [case

management order] … limiting discovery to information relating to Hospital Plaintiffs' public nuisance claims and Hospital Plaintiffs' special damages." (Emphasis added.)

Some of the specific information sought in this interrogatory is exactly what was later included by the plaintiffs in their "mitigation plan," including, for instance, information regarding the plaintiffs' "educational activities," "addiction treatment," "expansion of the use of naloxone" and "any other similar activities." Further, the interrogatory specifically asked for the "efforts undertaken by You" -- in other words, efforts that the plaintiffs now claim are part of their "mitigation plan."

Again, in 2021, the defendants served the plaintiffs with a set of requests for production of documents in which they requested "[a]ll documents, data, and information supporting or otherwise relating to the monetary and equitable relief [the plaintiffs] s[ought] to recover through this litigation, including but not limited to any alleged costs, expenditures, damages, harm, loss, or abatement costs." (Emphasis added.) This is an even broader request that would have included evidence of the costs that are now claimed (going forward) in the mitigation plan. The plaintiffs objected, in part, to those requests also.

11

A. Amended Scheduling Order -- Trial Set for July 24, 2023

In October 2022, the trial court issued an amended scheduling order, which provided as follows:

"a. Document production shall be substantially complete by October 5, 2022.

"b. Plaintiffs' Expert Disclosures [are] due by December 7, 2022.

"....

"d. Completion of Fact Depositions by January 30, 2023.

"e. Defendants' Expert Disclosures [are] due by February 28, 2023.

"....

"g. Completion of Expert Depositions by June 7, 2023.

"h. Track 1 trial to begin July 24, 2023."

(Emphasis omitted.)

In compliance with that order, the plaintiffs disclosed their expert witnesses in December 2022. Those disclosures indicated, among other things, that there were several experts who were expected to testify to the plaintiffs' claimed compensatory damages, which, according to the mandamus petition, were approximately $240 million. Specifically, those experts were expected to testify on, among other things, the "operational

impact" incurred by the plaintiffs when treating patients with opioid-use disorders.

Those expert disclosures <u>also</u> indicated that a few experts would testify about the plaintiffs' "mitigation" damages but did not list any additional amounts for those damages. For example, the plaintiffs' expert disclosures indicated that Dr. Joshua Lynch, a physician, would testify to "programming, resources, and/or strategies to reduce the harms associated with opioid abuse commonly found in patients with opioid use disorder who are treated at acute care hospitals." Those disclosures further indicated that Dr. Mireille Jacobson, an economist, would testify about "the economic impact to Alabama hospitals like Plaintiffs, including the estimated costs they would incur, from implementing certain <u>mitigation measures</u>," such as screening programs designed "to mitigate the harms they experience due to the … Defendants' alleged misconduct concerning prescription opioid shipments." (Emphasis added.) Based upon the materials before this Court, this appears to be the first mention of "mitigation" damages in discovery materials.

However, at that same time, the plaintiffs expressly reasserted their objections to the defendants' earlier interrogatories.  Although the

interrogatories to which the plaintiffs objected included a request for information regarding damages to "abate," they also specifically included requests relating to what the plaintiffs now label as mitigation costs. For instance, the interrogatories requested information for the <u>plaintiffs' costs</u> for educational materials, "providing addiction treatment, expansion of the use of naloxone," and "other similar activities or efforts undertaken by [the plaintiffs]."

### B. Plaintiffs Submit Supplemental Expert Report in May 2023 that States the Costs of their "Mitigation Plan"

Approximately 11 weeks before trial, on May 4, 2023, the plaintiffs produced a supplemental expert disclosure of Dr. Jacobson that, for the first time, expressly explained and itemized mitigation damages. That disclosure explained that Dr. Jacobson was "expected to testify regarding the economic impact to Alabama hospitals, including Plaintiffs hospitals, to <u>mitigate</u> the harms experienced because of the … Defendants' conduct concerning prescription opioids." (Emphasis added.) Dr. Jacobson's testimony would further include "the estimated future costs Plaintiffs would incur from implementing certain <u>mitigation</u> measures, including education, workforce development, naloxone, screening programs …, Medication-Assisted Treatment …, and telehealth resources." (Emphasis

added.)

The plaintiffs' supplemental disclosure also included a report from Dr. Jacobson detailing the estimated costs of a 20-year "mitigation plan" for the plaintiffs, which appeared to contain much of the information that the plaintiffs had previously objected to disclosing to the defendants in response to their 2021 discovery requests mentioned above. In that report, Dr. Jacobson provided estimates for the costs of various services and programs suggested by another expert -- Dr. Lynch. Those included educational materials like community mailers, a Web presence, community presentations, and employee education. It also included costs for "workforce development," access to naloxone, telehealth resources, and screening programs in hospital emergency departments. Notably, even at that time, the defendants did not yet have a copy of Dr. Lynch's report detailing the services and programs recommended in the "mitigation plan" for which Dr. Jacobson provided dollar estimates.[7]

---

[7]It is unclear from the materials before our Court the exact date that the defendants ultimately received Dr. Lynch's report on mitigation, but the materials before this Court clearly show that this report was not available until after Dr. Jacobson's report. In fact, the parties appear to agree that this report was provided after Dr. Jacobson's deposition and that Dr. Lynch was deposed still afterwards.

Dr. Jacobson's new report estimated costs between $160 million and $230 million would be necessary to implement such a "mitigation plan." Five days later, the defendants deposed Dr. Jacobson.

II. Pretrial Motions

After the disclosure of the plaintiffs' cost estimations for their "mitigation plan," the defendants, on May 30, 2023, moved the trial court to continue the trial date of the "Track One" trial, arguing that a continuance was necessary due to "several outstanding areas of fact and expert discovery that cannot be completed under the current trial schedule." The trial court denied that motion.

On June 2, 2023, the defendants moved the trial court to allow discovery as to the plaintiffs' "abatement" claim in light of their newly presented "mitigation plan." The defendants argued that they were entitled to an opportunity to investigate the plaintiffs' "historical steps to address the effects of the alleged nuisance in their service area, their plan to do so in the future, and historical, ongoing, and projected efforts to remove the alleged nuisance by other public and private actors in the area."

On June 13, 2023, the trial court ordered the plaintiffs to state

whether they intended to seek abatement damages and, if so, to "explain why they should not be estopped from pursuing those damages at the Track 1 trial."

In their response to the trial court's order, the plaintiffs maintained that they were not seeking abatement damages in their "mitigation plan." Instead, the plaintiffs claimed that they sought compensatory damages, which, according to them, included the cost of mitigating the damages they would incur in the future. They also argued that the defendants had placed mitigation damages in issue in the litigation by "assert[ing] a failure to mitigate damages" as an affirmative defense.

On July 3, 2023 -- when the trial court had not yet ruled upon their motion to allow discovery but three weeks before trial -- the defendants petitioned this Court for a writ of mandamus directing the trial court to grant (1) the defendants' motion for discovery on the information relevant to the damages included in the plaintiffs' "mitigation plan" and (2) their request for a continuance to complete the necessary discovery.[8]

---

[8]The defendants did not initially request that this Court stay the trial-court proceedings; instead, a stay had been requested while we considered the separate mandamus petition in Ex parte McKesson Corp., supra, which had previously been filed in this Court. The stay in that

After the defendants' mandamus petition was filed, the trial court entered an order granting the defendants' motion in part and denying it in part. The trial court denied most of the motion. It found that most steps in the "mitigation plan" related to "specific measures … aimed at reducing the impact of the alleged nuisance on the hospitals, as opposed to reducing or eliminating the nuisance itself," including: "employee training, costs associated with naloxone and other supplies needed to treat OUD [opioid-use-disorder] patients and expansion of telehealth and outpatient treatment of OUD patients." However, the trial court also found that a few of the measures in the plan went "beyond reducing the economic impact of the crisis on the hospitals" and were instead "aimed at reducing or eliminating the alleged public nuisance itself." The trial court concluded that those measures -- such as "requir[ing] [the] [d]efendants to pay for resources to educate members of the community

---

matter was issued July 10, 2023. Therefore, the trial scheduled for July 24, 2023, did not occur.

After this Court released its decision in Ex parte McKesson Corp., supra, the defendants requested that the trial court stay the proceedings pending the resolution of this petition, which the trial court denied. The defendants thereafter filed a motion to stay the trial-court proceedings in this Court, which has not been ruled upon.

18

at large on the dangers of opioid use" -- constituted "abatement" damages. The trial court then found that, "[b]ecause the abatement claim ha[d] been abandoned as to Track 1, no claim for such relief may be advanced at the Track 1 trial," and it therefore concluded that "there [was] no need for the discovery requested by the [d]efendants."

## Discussion

In their mandamus petition, the defendants argue that the trial court has essentially allowed the plaintiffs to "add" a new claim -- or at least a new form of damages -- in their "mitigation plan" and, at the same time, has foreclosed discovery on that issue. According to the defendants, the plaintiffs seek new damages as follows:

> "Their proposed abatement plan demands $160 to $230 million from Defendants to fund hospital programs to (1) educate the public and healthcare profession on the risks of opioids, (2) train hospital staff on treating opioid-use disorder ('OUD'), (3) increase access to overdose medication, (4) increase access to OUD medication, and (5) increase access to OUD telehealth services. This plan presents a very different form of relief from Plaintiffs' damages claim, which seeks to compensate the plaintiff-hospitals for certain alleged internal hospital costs."

Petition at 7 (emphasis and footnote omitted).

As noted above, the plaintiffs respond by arguing that the plan does

19

not assert a new claim or form of damages. Instead, they argue that their claims seeking to recover for their efforts to "mitigate" damages -- a measure that the plaintiffs are required to take under Alabama law -- have been at issue throughout the entire litigation. Answer at 13 (citing Avco Fin. Servs., Inc. v. Ramsey, 631 So. 2d 940, 942 (Ala. 1994)). The plaintiffs also assert that the defendants "had ample opportunity to depose [their] experts" on the "mitigation" damages and that the defendants earlier "deposed [their Ala. R. Civ. P.] 30(b)(6) corporate witnesses and individual employees" and thus were not deprived of meaningful discovery. Answer at 15-16.

Once again, I see no reason to debate whether the estimated costs set forth in the plan constitute damages for "abatement" or "mitigation" at this point in the litigation. Regardless of the label of the plaintiffs' claimed damages, the defendants repeatedly sought discovery directly relating to the costs of the services and programs included in the "mitigation plan." Yet the plaintiffs denied the defendants that discovery. In fact, at one point, the plaintiffs even argued in briefing to the trial court regarding prior discovery disputes that the information relating to their "**Treatment Drugs**," such as naloxone, was not discoverable

20

because it was "not an issue in the trial." (Emphasis and bold typeface in original.)

I also note that the costs that the plaintiffs incurred in performing those services and enacting those programs in the <u>past</u> is directly relevant to the costs the plaintiffs estimate that they will spend on those same services and programs in the <u>future</u>. The defendants are therefore entitled to this information before going to trial.

The defendants are also entitled to an opportunity to <u>rebut</u> the damages claimed in the "mitigation plan." This might include, for instance (1) retaining an expert witness to evaluate the validity of the estimated costs or the necessity/scope of the mitigation plan and producing a new expert report,[9] (2) seeking third-party discovery relevant to the necessity and scope of the plaintiffs' mitigation plan (for

---

[9]On June 30, 2023, less than a month before trial was scheduled to begin, the defendants submitted a supplemental expert disclosure "in an abundance of caution." Maintaining their position that they had "not had the opportunity to conduct any discovery on Plaintiffs' abatement claim," the defendants disclosed a new expert to respond to the opinions given by Dr. Lynch and Dr. Jacobson. I note that, because the defendants had been denied discovery relevant to the items included in the mitigation plan and their cost estimates, the defendants did not have the requisite materials for their newly disclosed expert to have the ability to respond and to rebut the claims set forth in the plaintiffs' "mitigation plan."

instance, information regarding the scope and detail of the abatement plan of the State of Alabama arising from its own opioid settlements (see note 4, supra) which might be relevant to the need or scope of the plaintiffs' own plan), or (3) seeking documents and seeking fact depositions from the plaintiffs regarding the past and future costs (and the actual future plans of the plaintiffs) relating to these types of "mitigation" actions.

The plaintiffs argue that the defendants were not denied discovery related to their "mitigation" damages because the defendants had the opportunity to depose their expert witnesses -- including Dr. Jacobson and Dr. Lynch -- their hospital representatives, and their hospital employees.

Although the defendants acknowledge in their mandamus petition that they "have been compelled to ask a limited number of [the p]laintiff experts and fact witnesses in recent depositions about [the p]laintiffs' abatement plans," Petition at 9 n.23, they also point out that "[t]hose examinations took place without any other party or third-party discovery" relating to this new theory of recovery. Id. (emphasis added). Likewise, the defendants note that those depositions "merely confirmed

the necessity of further discovery." Reply brief at 10.

Furthermore, Dr. Jacobson's deposition occurred just five days after the plaintiffs produced the "mitigation plan." In addition, the fact depositions of the hospital representatives and employees occurred <u>before</u> the plaintiffs disclosed to the defendants the future mitigation plan and the additional $160-$230 million claimed in "mitigation" damages. Moreover, the defendants did not receive Dr. Jacobson's report estimating the amount of "mitigation" damages claimed by the plaintiffs until 11 weeks before trial. Even at that point, the defendants did not have Dr. Lynch's report detailing the basis for the services and programs for which those costs were estimated. Further, the deadline for fact depositions expired before either of these expert reports were disclosed, and the deposition of Dr. Lynch did not occur until June 5 (only seven weeks before trial).[10]

Given that the defendants were previously denied discovery

---

[10]I do not intend to suggest in this dissent that the plaintiffs have acted improperly. I do not believe that it is helpful to attribute blame to <u>any party</u> for their objections, disclosures, choice of words, failure to press earlier or harder for discovery, or timing of disclosures. Regardless of blame, this action is poised to go to trial on a claim for very significant damages without adequate discovery. This is not the way our judicial system is designed to function.

relevant to specific items asserted in this "mitigation plan" and that the total damages sought in this case will now be almost half a billion dollars, I believe that the defendants are entitled to an opportunity to seek discovery of materials and information relevant to the plaintiffs' purported "mitigation plan."

<u>Is this Particular Discovery Dispute Subject to Mandamus Review?</u>

Even if the defendants are entitled to the discovery they request here, however, there remains the question whether the specific discovery issue they have raised is subject to mandamus review. Our Court has repeatedly emphasized that a writ of mandamus is an extraordinary remedy that is only appropriate when the petitioner demonstrates: "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." <u>Ex parte BOC Grp., Inc.</u>, 823 So. 2d 1270, 1272 (Ala. 2001).

Our Court has also stated that, "[g]enerally, an appeal of a discovery order is an adequate remedy, notwithstanding the fact that that procedure may delay an appellate court's review of a petitioner's grievance or impose on the petitioner additional expense; our judicial

24

system cannot afford immediate mandamus review of every discovery order." Ex parte Ocwen Fed. Bank, FSB, 872 So. 2d 810, 813 (Ala. 2003) (footnote omitted). Our Court has, however, recognized that,

> "[i]n certain exceptional cases, however, review by appeal of a discovery order may be inadequate, for example, ... when the trial court ... denies discovery going to a party's entire action or defense so that, in either event, the outcome has been all but determined, and the petitioner would be merely going through the motions of a trial to obtain an appeal .... The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case -- that is, one in which an appeal is not an adequate remedy."

Id. at 813-14 (emphasis added). Because discovery matters are "within the trial court's sound discretion," our Court will only consider a trial court's ruling on a discovery issue via mandamus review "(1) where there is a showing that the trial court clearly exceeded its discretion, and (2) where the aggrieved party does not have an adequate remedy by ordinary appeal. The petitioner has an affirmative burden to prove the existence of each of these conditions." Id. at 813.

Although Ocwen, supra, addresses review of an order denying discovery "going to" a party's "entire" defense, I cannot ignore the fact that the purported mitigation damages in this case would be one of the largest awards in the history of Alabama courts -- hundreds of millions

of dollars -- and would potentially double the ultimate damages awarded in this case. Thus, review of a discovery issue like the one here by a petition for a writ of mandamus would fall within the purview of <u>Ocwen</u>. <u>See also Ex parte Hartley</u>, 50 So. 3d 1102, 1104-05 (Ala. Civ. App. 2010) (holding that a challenge to the trial court's refusal to allow discovery as to "one of the principal components of the relief sought ... falls within the exception noted in <u>Ocwen</u> pertaining to 'discovery going to a party's entire action or defense ....'" (quoting <u>Ocwen</u>, 872 So. 2d at 813-14)).

Further, due process requires that the defendants have an opportunity to discover the information relevant to the damages claimed in the plan and be afforded sufficient time to prepare a defense. <u>See Ex parte Medical Assurance Co.</u>, 862 So. 2d 645, 650 (Ala. 2003) ("[D]ue process demands that the parties … have a fair chance to prepare for trial, to conduct discovery, … and to conduct other necessary pretrial activities."). <u>See also Ex parte Johnson</u>, 485 So. 2d 1098, 1106-07 (Ala. 1986) (explaining that the purpose of discovery includes "'"aid[ing] a party in preparing and presenting … his defense"'" and "'"eliminat[ing], as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases ...."'" (quoting

Ex parte Dorsey Trailers, Inc., 397 So. 2d 98, 103 (Ala. 1981), quoting in turn Am. Jur. 2d Depositions and Discovery § 155 (1965)). It is for all of these reasons that I believe that the defendants are entitled to mandamus relief here and must therefore respectfully dissent to the denial of their petition on that ground.

However, despite my belief that the defendants are entitled to have some opportunity to conduct discovery and supplement their expert reports in relation to the "mitigation plan," I must emphasize that I believe that the trial court remains in the best position to make the decisions on how to structure discovery and deadlines going forward. This is especially true given the delays that have occurred while this mandamus petition has been pending. Thus, exactly how much time the defendants should receive to adequately discover facts and update expert testimony for the damages claimed in the "mitigation plan" is a decision that should be reserved for the trial court.